Good morning, your honors. Good morning. Okay, I wasn't wondering about that. United States v. Jose Manuel Garcia, Scott Edgerton for the defendant this morning. The case, the facts, or it comes down to three parts. This is all about three parts. Bad information being given to the jury for consideration, the prejudice that it caused, and the sentencing. Those are the three basic parts of this. To get into all the information, I mean, there's no possible way to hit every point that was improper for the jury to hear. So on what basis are you contending that the information was, I take it that you're talking about Deputy Small's testimony and the anonymous letter. That's pretty much what you're talking about. Pretty much. There was some of it also in Agent Bowen's testimony, but the grand marshal part of it is in Small's testimony. Let's start off by saying that Officer Small couldn't even identify the defendant. When he was asked, who is this, is this Mr. Aguirre, he didn't even know who he was. And then think about the volume and the content of the testimony Officer Small gave. He didn't even know who he was. What difference does that make? Because the information that he gave is that this is a big time dealer. He talks several times about phone calls that were made. How could he possibly know about those phone calls? He couldn't. That was, obviously that was prejudice, but it was seven. It was inadmissible lay testimony that he talked about drug deals that happened. It's for the jury to decide whether a drug deal happened. In what context was this testimony offered? The context of the testimony, I think in the eyes of the government, was to give a background or at least that was the guise under which they, which they presented it was a background. But there was clearly information that came in that was testimonial that in no way served as a, as a testimony. As a matter of fact, a couple of times in the middle, if I can find it, the Mr. Shogren actually referred to what Mr. Small or Detective Small was saying, as testimony. There was so, there was so much information, so-called background that he was putting in that Mr. Shogren lost, lost, lost track as to whether it was testimony or background information. Let me ask you a question. What's your best case authority to support your argument that this testimony that was characterized as background testimony was impermissibly admitted? Well, Your Honor, obviously the key upon which I'm relying is Crawford. And then I think the two cases, I'm trying to think of, I think it was Garcia that came out of the Second Circuit, tie together to say that there's no way you can bring all this information in, even under the guise of background. Right. But Crawford is a confrontation clause case, right? So if, if the, if you were able to cross-examine the witness, you don't have a Crawford issue, do you? Nobody cross-examined Rodolfo Gonzalez. No, but I mean the person who's testifying. Absolutely. The person who's testifying. So you're saying you're right to, you're right to confront the person who provided the information. Is that what you're saying? No. What are you saying? That's why I said it's kind of, kind of convoluted. There's at least two sides. One is Officer Small brought in a lot of information under summary testimony that he had no personal knowledge. Two, he, he testified over and over voluminously what Rodolfo Gonzalez, rather, what Rodolfo Gonzalez said. That's what I'm saying. You're saying the Crawford, the Crawford violation comes in because Rodolfo didn't testify. Yes, ma'am. Yes, that's exactly correct. So, and, and it was let in under background. But again, there was so much information let in under that, that there's no way for the, realistically, for the jury to keep track. Now Crawford does say you can let certain information in if it's not for the truth of the matter asserted. But again, the, the volume of information that was let in, and again, as you read through, Mr. Shogan lost track of that. He, he talked about it as testimony. So when the witnesses and the attorney lose track as to whether it's testimony or background, I don't think it's a far cry to believe that the jury lost track. Did the court give an instruction? The jury, the court did give an instruction in the second, I believe, near the second objection, Mr. Alden's second objection, and he gave an instruction in the, in the instructions. However, if you read through there, there were times where there was testimony, then background, then testimony, then background. It was, it would be, the testimony and the so-called background were so intertwined, it literally, I mean, for me, I had to read it two or three times, and I'm not sure I've got it broken down yet exactly which was the, you know, broken down exactly. Here is a juror listening to it once, and that juror's supposed to ferret out which sentence was testimony and which sentence was background. I think it's untenable. Had Crawford been decided by the time this case was tried? I'm sorry? Had Crawford been decided by the time this case was tried?  Was there a Crawford objection lodged at trial? I don't know that it was a, Crawford was discussed. Actually, Crawford was brought up by Mr. Sjogren, I think more than Mr. Alden, but certainly, Judge Shea, Honorable Judge Shea, did consider Crawford at least to some extent. I know they discussed it. It, it appears that some of the information you're complaining about was not objected to. For example, the anonymous letter, there was no objection lodged to that being received, even as background information. Is that right? It, I mean, it, it can appear that way, but I would pose that Mr. Alden objected twice regarding this type of information. For him to object to all, you know, again, there would be testimony and then there would be background. For him to object every time would completely, I think, break up the continuity of the case. And I think he, by objecting twice before, he made it clear he didn't want information in, unless A, there was personal knowledge, and B, the person testifying was on the stand. So he had levied two, he levied two objections in there, and as far as I can tell, you know, by the time that came in, he understood what Judge Shea was going to order, so it was superfluous, waste of his time to get up and object to that. In my brief, I actually, I'll admit, I made a mistake. I want to attack the But obviously, Booker takes care of a lot of that, but I'm still going to attack that in this way. I believe that when the judge sentenced Mr. Aguirre-Gonceta, he believed that he had to follow the guidelines. And to whatever extent he sentenced Mr. Aguirre-Gonceta, believing he had to follow the guidelines, I believe he should be resentenced with the Honorable Judge Shea having the knowledge that he's not held by those guidelines. He can use whatever Guidelines are mandatory minimum. There were mandatory minimums, so I mean, it's a two-part. Obviously, I think Mr. Gonceta deserves a new trial, because the trial is the main thing. I understand the conviction arguments, and for those with the government as well, but on the sentencing, it's a common inquiry by us at this time with regard to whether a defendant wants to exercise or present the Ameline en banc decision and Moreno-Hernandez's near entitlement to a limited remand. But one place where that stops is if it's the sentence is driven by a mandatory minimum in the statute, because the guidelines being advisory doesn't affect the mandatory minimum. And my impression in this case is that the sentence was driven by the statutory mandatory minimum, in which case there's nothing to go back and inquire about with regard to the Booker line of cases. Isn't that the case here? Ultimately, absolutely, you're correct. And I'm basing that argument on presuming or assuming that we went on the prejudice argument or that the trial isn't fair. Or maybe you're trying to preserve an attack on mandatory minimums, which has been lodged in many cases. We've got our own cases that say that Booker doesn't affect that. Obviously, we're going to have to follow that here, so you've preserved the argument. But I don't – I want to make sure you're not trying to say something beyond that. I'm not. And I would agree that Booker does not affect that. Again, I want to point out that Officer Small testified that Mr. Aguirre-Gonzalez was at three or four – actually, more than that – five drug deals, and then he testified earlier that he didn't even know who he was. What I really want to concentrate is – and I'm – just look through this testimony regarding what was let in according to what Mr. Rodolfo said. Rodolfo got all kinds of information in. Basically, it was in run around the Crawford in that this – Rodolfo got to testify as to who Aguirre-Gonzalez was, that he was meno, his code name was meno, that he was a big-time drug dealer. None of that information came out on direct testimony, not a single thing. As a matter of fact, throughout the testimony, throughout all of it, there's not a Only one other place in the testimony, and it was a witness by the defendant, said that at times he was called meno, but there was no connection that, in fact, Aguirre-Gonzalez was this meno. And the main person we have connecting him is Small, who didn't even know who Aguirre-Gonzalez was. Give me just a moment. I also – I talked about summation. As you read through Mr. – or Detective Smalls, he constantly – I'll say 116. I mean, well, there's just many places where he refers to we and they and officer so-and-so and talks about the drugs that were actually turned in. The majority of the time he's talking about that, he has no personal knowledge. And I think it's clear in the case law that I gave you, ultimately, that, yes, you are allowed to have some background. Yes, the jury gets to consider that this did not happen in a vacuum. But you don't get to say, oh, by the way, this person was – I want to give an example, if I may. A person is on trial for murder, and they've maybe murdered several people, or you think they did. And, well, we're going to – an officer is up there testifying and say, well, I know this guy. He's really reliable. He's a really nice guy. He's not going to be here to testify. But he told me that he saw this guy stab Jake down the street. And while he was stabbing him, he said, I'm going to kill more people. And then he slid his sword and had blood all over him. Now, that's just background to say why we started our investigation. If that's a fair trial, I think, well, it's not a fair trial. And that's exactly what happened here. Officer Small got to bring in Mr. Gonzalez. Mr. Gonzalez is a big-time drug dealer. He's been doing this for some time. Even though none of those ounces, the pounds, et cetera, none of that ever happened. Nobody ever connected him as actually this mentor. Officer Small testified that, in fact, this was the man that lived at 25 Octave. And then when he was asked, well, how do you know that? The fact is, he didn't know. He was relying on information from other detectives. I'd say at least 80% of his testimony was based on personal knowledge. He was giving a summary of the case, which gave an information hearsay. And I know it was let in under the guise, and I say guise, of background and not for the truth of the matter, certainly. But when you have that kind of voluminous testimony from someone who's not there, I say it's impossible for a jury to ferret out what they were supposed to consider and what they were not supposed to consider, especially Counsel, is it your argument that even if that evidence is taken out of the trial, that there is not sufficient evidence to convict Mr. Gonzalez? Well, I certainly don't think it's a slam dunk that they would have convicted Mr. Aguiar-Gonzalez. And when you have well over 60 pages, I think it's something like 70 pages of this type of information, I don't think we can at all begin to presume or assume that the jury would have convicted him without this information. In any case, this is obviously unfair to let all that extraneous so-called information hearsay into the hearing of the jury. I don't think there's any real, I mean, ultimately, can we know? We can't know, but I think it's certainly realistic to say that the jury certainly would have had a different mindset had they not heard all the information from Mr. Rodolfo, had they heard not all the summarization of the investigation by Detective Small, certainly their mindset would have been different, at least. Is that enough that the jury's mindset would have been different? Is that enough to constitute reversible error? Well, I think there are two aspects to this. One, I certainly do think that, I think there's a likelihood, I mean, I don't know. Ultimately, there's a likelihood, there's an absolute that their mindset would have been different. What their decision would have been, I think it's hard to tell. But when almost 20% of the information is impermissible before a jury, I think that in and of itself becomes such a constitutionally impermissible trial that we need to start again. I want to make sure I understand the point you're making about evidence that you say is inadmissible. You have acknowledged, I think, that this came in for a non-hearsay purpose to show why the detective focused on the defendant. Right. Is the objection that it was nonetheless overly prejudicial under Rule 403? Is that the nature of the objection, that too much came in or that there wasn't a balancing of probative value with the prejudicial effect? Absolutely, and that was in my brief. I believe I relied on a second circuit case for that. But absolutely, even if this was permissible under Crawford, that the type of information, again, that he was a big time drug dealer and the volume of the information was impermissible. And certainly, it prejudiced Mr. Aguirre-Gonzalez. I want to point, and I think Mr. Shogan, at least in his brief, misunderstood something. I wasn't saying that it was wrong in and of itself for Detective Small to talk about his own credentials or to talk about the reliability of the informant, Rodolfo Gonzalez. What I'm saying is, all the information, and there's quite a bit of it when you look in there, regarding how he handled informants, his experience handling informants, how reliable, there's one part in there where Mr. Shogan asked him, is trust an issue with confidential? Absolutely. Did you trust him? I trusted him. He was great. He got a lot of convictions. He went on and on about how great Rodolfo Gonzalez is. How is that relevant? Why would you even bring that in, unless you're going to consider everything that he said? And when I say he, I mean Mr. Gonzalez said, through Sean Small. Unless you're going to consider what he said for the truth of the matter asserted, why would that information even be proper? Why would it even be important? And you can see throughout there, and again, there's so many references, where Mr. Shogan himself, you can tell, is beginning to rely upon what Sean Small said, Rodolfo Gonzalez. Basically, what happened is the government got this great eyewitness, key witness, and he didn't even have to show up. I mean, effectively, that's what happened. And there certainly was prejudice, even if you could say it wasn't admitted for the truth of the matter asserted. But again, I think that it goes too far. There comes a time when that kind of information is so poignant and so voluminous that. I mean, it would be different if, yes, we got information, maybe even we got a letter, which seemed to indicate that Mr. Aguiar may be involved in narcotic transactions, which spurred us to begin to look at him and see what was going on. But no, we received a letter, and the letter says, yeah, basically, I think his words were something like, yeah, basically, he's a drug dealer, and he's dealing in methamphetamines and marijuana and cocaine. By the way, none of that ever happened. There was methamphetamines, but the cocaine dealing and the marijuana dealing, none of that was ever showed up. None of that was ever found at his house. None of that was ever found on his property. There was methamphetamine. Also, it certainly would have, I mean, if you read all the evidence regarding the meth lab, everything Mr. Gancita said he was doing matches up with the evidence that was found. All the tortellini and all the evidence that was found was spread out all over the place. He couldn't have been making it right then and there at that time. And there was no fresh methamphetamine made. The pseudoephedrine, I hope I'm pronouncing that right, there was none of that found. It was found in solutions, which comports with what he was saying, that he was trying to purify. He wasn't trying to manufacture methamphetamine. There were no ephedrine tablets found. There was nothing like that in the house. So everything he said comports with the evidence that they actually found. But by then, the jury had been flooded with, this guy's a major drug dealer. He's a big guy. We've got to get him off the street before he starts giving methamphetamine to our children. Counsel, did you want to save some time for rebuttal? I do, Your Honor. That's fine. Thank you. Good morning. Gregory Shogren for the United States Appellee in this case. First of all, the appellee's brief was prepared by one of my peers. I was having medical problems at the time. And so one thing that was not pointed out or illuminated in the brief was that this information that's complained of today by counsel was in the context of the defendant offering a duress defense. And that was in the trial brief, defendant's trial brief. That was in the opening statement. That was in the closing statement. And that was in Mr. Aguirre's own testimony, because he did testify in this case. But that doesn't change the fact that it was only offered for background. You're not saying that the testimony was offered as substantive evidence, are you? No, but I'm saying, and I'll get to that. My point is that this should have been pointed out to the court that this was, we knew going into the case that this defendant was going to be trying to portray Rudolpho, the informant, as someone who was coercing him into selling the methamphetamine, which fired the investigation. And counsel has put all of the information, and putting it under one rubric of bad information. Actually, there are several types of information that came in through the testimony of Detective Small. Number one, the informant information, the so-called hearsay, the informant statements, first of all, I'd say that I could only find two instances where the detective, Detective Small, paraphrased what Rudolpho had said. And those, only two in the record, and I'm not saying that there are only two, but I could only find two that appellant's counsel alluded to in his brief. So- I understand, you're speaking broadly there. It isn't just an alleged quotation or near quotation, but the conveyance of information that Detective Small did not possess himself, but he's relaying based on information he got from the informant. That only happened in two instances? That's, yes, Your Honor. That's what appellant's counsel has cited in his brief, but I'm not sure. You know, don't hold me to that figure. Maybe it was three times, maybe it's four times, but I will say it was very limited. Any quotations about Rudolpho were very limited. I thought I heard him say that something like 80% of Mr. Small's testimony was not his personal knowledge. Well, and I'll get to that. I wanted to isolate these because we're talking about three different groups of And the first one that I was trying to explain was about the informant's so-called quotations, or they weren't really quotes, but paraphrasing what the informant had said or done. And the court was very careful, the trial court was very careful to instruct the jurors that they were not to consider anything that Rudolpho had said as evidence in the case. That it was only to establish how the investigation transpired and why it transpired. And that's the quote about, and that relates to the letter also. That letter was not admitted into evidence. And counsel was correct here today in saying that, detect a small paraphrase of the letter by saying something to the effect that the letter said that he was a drug dealer, not to mention a meth manufacturer, something to that effect. And on the next page. I have a question for you. I don't understand why that information was even relevant if you say from the get-go this was going to be a duress defense. To me, duress implies I did it, but I did it under coercion. Was there a question in this case about whether the defendant committed the crime rather than why he committed the crime? Well, that particular information was, we were still in the process of showing how the investigation unwound and what was going on. In fact, in the record there, and I think it's at pages 117 and 118 of the trial record is where it's found that, then I say what happened next in the investigation. I'm asking on at least two occasions with regard to the letter, with regard to, I think, a telephone number or something like that, then what did you do next? It's obvious from the context of those questions and the record at that point that that was the second group of information which was providing background, which, and I've cited, or my associate has cited in the brief, that that's proper background information. As I think it's obvious that the government is not required to present its case in vacuum. This was all showing how the investigation commenced. And I understand it's a common technique, and it's understandable to put things into this context, but it's not like the government's on trial for launching an investigation. It doesn't have to justify what it's done. And so, as I read the brief prepared by your colleague, we have this section of facts relevant to the sufficiency of the evidence. I go through here, and I see lots of things cited as being from the CI, who I take to be the confidential informant who did not himself testify. And it starts with the facts cited by defense counsel. During the investigation, it was learned that Meno was actually the defendant. Is there any independent evidence of that other than the testimony of Detective Small obtained from the confidential informant? As far as the nickname Meno, yes, there's another place in the record where, and I can't cite to it, but there's another place in the record where the name Meno, Meno Oak, in fact, defense counsel is where it is, and he either asks a question or says something, and he uses the nickname Meno. But again, this, you know, there are two reasons for that second group of information. Number one is background, and I still think it's relevant to diffuse the duress defense, because we're trying to show at this point. It doesn't make it any less hearsay. It may be something you want to get in, but if it's simply Small repeating what has been told by somebody else, you've got exactly the same Crawford problem. Well, okay, but I was skipping away from that. Okay. I think I thought I addressed the hearsay. I mean, the trial court instructed the jury that's not to be considered for the truth of the matter. Okay. Let me be very specific. I read your brief, and the first two pages, identified as being facts relevant to the sufficiency of the evidence, absent admission to the disputed testimony, the first two pages starts with the disputed testimony, what the CI is supposed to have said. And it struck me, wait a minute, this is supposed to be the part without the disputed testimony, and yet I take it the CI, the CI is the guy that didn't testify, right? Is that Rodolfo? That's right. So why does the brief start and go for two pages about what the CI has told somebody if the CI is not testifying? And this part of the brief, and I know you didn't write the brief, and I'm not faulting you, the brief writing technique, but it suggests to me that the story has to be told, at least in some part, with what the CI has said, but the CI didn't testify. So it's a problem, isn't it? And I'm trying to focus on Mr. Etherton's submissions, Your Honor. I guess I can't answer that. I'm just trying to explain that the quotations or what the hearsay, or alleged hearsay of Rodolfo was limited. It was further mitigated by the fact that counts two and three were dismissed, and those were the counts most closely associated with the informant's participation in the investigation. Counsel, what's your response to opposing counsel's representation that even you became confused regarding the extent to which the testimony was background information and substantive testimony, because you referred in your argument to the background testimony as evidence? Did you hear that argument? I didn't understand what he meant, actually. I'm not denying that I'm frequently confused, but I didn't understand it in this context. Maybe it will help if I skip to the third group of information that comes under the rubric of bad information by Detective Small. And the third part, I think, was required as foundational information, background information of Detective Small for Rule 702 as an expert witness because he did testify. He was going back and forth, I think, in his testimony, which is common in these types of cases from 701 lay testimony to 702 expert. Was he qualified as an expert? Well, he wasn't. The Court didn't say, now I qualify you as an expert. But it was that was the preliminary, those were the preliminary questions asked of Detective Small. But can we assume that it was expert testimony if he was not proffered as an expert and not designated an expert by the Court? Well, I don't know of any authority that requires that. And I've never heard of any that requires the Court or the counsel offering the expert testimony that it has to be, has to have this imprimatur in front of the jury that this is now an expert. When I said as a trial judge, if someone offered a witness as an expert, that had to come through me first. There were no implicit experts in the trial. I thought that was generally how it was done. That's probably the better procedure and one that I'll follow in the future. But I never have in the past, I've never, I don't recall ever having asked the Court to qualify explicitly an officer or an agent or anybody else as an expert. I will say that in this case there was an instruction that explained what an expert was and whether or not the jury and, well, the standard pattern instruction for this circuit concerning an expert witness. But anyway, so part of that bad information, as counsel says, was foundational for Rule 702 testimony. So my point is in all of this is that there are three types of information that came in through Detective Small. And it wasn't all voluminous and just bad. There were bases for each one of it. And I still think, as I started to say again, that it was relevant in part to help diffuse this and explain to the jury what this was about, what this duress thing was about. Because they had to know, they had a right to know a little bit more about this informant and about the investigation because we knew what was coming down the pike, and it certainly did because Mr. Aguirre did, in fact, testify. How did the details of the anonymous letter diffuse the duress defense? It seems to me that that was overkill. It's one thing to say we got an anonymous tip pointing at this fellow and so we pursued it. It's another thing to read all the details of an anonymous letter to a jury and tell them don't pay any attention to those for the truth of the matter asserted. How did those details affect the duress defense? Well, Your Honor, the details, there weren't very many details. It was probably one whole sentence or less in which the detective related that they got an anonymous letter that said he was basically trafficked in controlled substances. There were no other details. There were no specifics in the information. Unless you consider that information for the truth of the matter asserted, how does it possibly counter the duress defense? Well, it seems to me that if a defendant is, if there's evidence, information indicating that the defendant is involved in drug trafficking, well, then it's ---- But that depends upon the truth of what the C.I. says. I mean, it seems to me this is exactly the problem. I can't understand what this testimony is supposed to be about unless you accept what Detective Small said that he was told by the informant is true. That's why I look at your brief. Several times there's a citation of what the C.I. did to purchase an ounce of meth in August. In September there's another one. In October there's another one. At one point the C.I. relinquishes custody of an exhibit, exhibit 5, which is tested, 54 grams containing meth. And unless all of that is true, what difference does it possibly make? I see the Court's point now. And, well, I guess I would agree to that. I would have to concede that that's certainly a conclusion. So I think what I'd like to ask you to focus on now is what's left. I mean, I think there is some problem with regard to some of the things that came in. Was it prejudicial? And as I go through here, and your brief does a good job of going to this part, they found meth all over his house. There is evidence. So at what point does it – now, we don't have a bright line. At what point does background get to be too much? I think we've established there is some problem here. Now you've got to put it back in the – unless you're prepared to say that we should reverse and send it back, I think your task becomes to establish or speak to the issue of whether we've got a prejudicial problem here. Well, and then I think the analysis becomes what is the evidence other than that. And as the brief said, and as I would tell the Court today, the evidence against the defendant was overwhelming. Not only the evidence gleaned from the investigation. There were recorded conversations. This investigation went from working with the informant to the undercover DEA agent who recorded the conversations, received the methamphetamine from the defendant on two occasions. The defendant apparently encouraged the undercover agent to buy more methamphetamine to engage him in additional purchases because he gave him a sample of methamphetamine. He talked about quantities, prices, about being able to deliver it to the agent in federal way, Washington. Is that Agent Garza? Yes. And he did testify? Yes, he did, Your Honor. So we have an abundance of evidence in the defendant's own statements which were recorded. And in Agent Garza's presence, that alone is very significant because the defendant, I mean, he lets it all out then in his conversations with Agent Garza. That leads to the eventual execution of the search warrant at the defendant's residence. And as has been said, methamphetamine was found throughout the place. The evidence is abundant that there was an odor associated with the manufacture of methamphetamine as the search warrant was executed. And the opinion was of the agents, the ones specializing in methamphetamine manufacturing, if you will, was that methamphetamine was being manufactured at the time. The accoutrements of manufacture of methamphetamine were found there. Trace amounts of pseudofedrin used to manufacture methamphetamine. And methamphetamine was found in the toilet. The defendant admitted later after being interviewed by agents that he, in fact, was manufacturing methamphetamine. And he admitted on cross-examination that he was, that he had sold methamphetamine and that he was, he admitted most of the drug sales but said, you know, retained the duress defense on cross-examination. And then, as I said later, he admitted that he had manufactured the methamphetamine. The expert testified, the physician, who was a specialist in pulmonary disease and pulmonary physiology, that what was going on there was a substantial danger to human life with regard to endangering human life while manufacturing methamphetamine. That was unrebutted by the defendant. And the only, the only evidence presented concerning the defendant's theory that he was merely cleaning methamphetamine for his own use was the defendant's own words. And there was no other word. Could I ask you a question regarding the background information? What's our standard of review in your view? I'm sorry. On background information? The background information that's being objected to. Well. The testimony of. I think that's, I think it's evaluated under the abuse of discretion standard by the trial court as to whether or not he properly allowed that to be. So do you concede that this was objected to? Which, which part? The testimony from Deputy Small. No. No, I do not. I do not. My, my recollection is, is that counsel did not object. Well, if he didn't object, we have a different standard of review than abuse of discretion. It's reviewed for, it's reviewed for plain error. And, and in that case, then, there would have to be evidence that the defendant's substantial rights were violated and the fairness of the proceeding was, was affected. And that, I don't think, has been alleged by counsel for appellant. And I don't think the evidence would support that anyway because, because the evidence is so overwhelming against the defendant, what with his own admissions. And, and I would say in, in summation that a review of the defendant's own testimony on cross-examination particularly shows the fallacy of this duress defense. And given that, with the duress defense diffused, there's virtually maybe 10 percent evidence in favor of the defendant and 90 percent in favor of guilt on the charges containing the indictment. One other thing. I have 28 seconds here. One thing that wasn't addressed and probably not addressed fully, and we did brief it, but that's whether or not Booker affects the sentencing in this case. And as the Court properly and correctly noted, count one, the sentence in count one is a life term of imprisonment, which is statutory, mandatory. The other ones, the 360-month sentences were under the guidelines. My review of the record is there's no indication that the Court said one way or the other that he felt constrained or not. All right. Thank you, counsel. Thank you. Butto. Thank you, Your Honors. It's interesting. Mr. Shogran began explaining why the testimony of the CI was relevant and why it was counted as substantive. Again, I point out that it was confusing even for Mr. Shogran, whether it was for the purpose of or being assertive for the truth of the matter, certainly it was to them. So I think, first of all, the government needs to make up its mind whether it was for the truth or not. And I think certainly it was. I think we need to hear from you on the prejudice side. Okay. Was the evidence so overwhelming that it didn't matter? Earlier when that question had been posed to me, I mean, I've done a couple of jury trials, and juries aren't always reasonable. But having considered the reasonable jury, absolutely. What I was, you know, what any particular jury would do at any time, it's impossible to say, and that's what I was referring to. But to a legally reasonable jury, absolutely. Without this other testimony of Rudolfo Gonzalez, the CI, it's reasonable. There's reasonable doubt that, in fact, there was duress. Certainly the information that there was no suit of federal found on the scene proves, I mean, I'm absolutely convinced that the evidence regarding the meth lab, not considering all that Rudolfo said, is that, in fact, he was not manufacturing methamphetamine. Well, there is independent evidence of that. Didn't Garza testify that he had conversations with defendants about where defendants said he was manufacturing? Yes. But the reason why they picked the 20th is because, according to Garza's testimony, Aguirre-Goncila was supposed to have a pound of methamphetamine. That's why they hit him that day, according to his testimony. Wasn't there. So according to his testimony, obviously, he also said that Mr. Aguirre-Goncila's phone had not been turned off. Later testimony by three other witnesses that believes that, in fact, his phone had been turned off. So Garza wasn't exactly tied in to the facts very well. And certainly the jury could accept that and take that. But then there's the fact that there was no pseudoephedrine there. You can't make methamphetamine without that. There wasn't even any residue around the house, on the table, on the washing machine, in the shed bag. It was nowhere. You can't make methamphetamine without it, plain and simple. But there was, and I'm taking it beyond your time. Okay. There was meth found around the house or mixtures containing meth in, like, a dozen different places. Right. Is there an innocent explanation for that? When you say innocent, absolutely not. But he admitted that he was an addict. And those kind of proportions are very consistent with someone who is an addict. He testified he had been popping or taking, however, quite frankly, I'm not an expert, meth the whole night before. It's consistent with someone who can't get enough of it. And the meth in little baggies. They didn't find the baggies anywhere else that he would have been putting that methamphetamine in. There wasn't, like, a stash. Usually when you go into a place like that, you find little baggies of meth that they're pouring it into, nonexistent. There was no fresh meth made. All the meth that was there was dried and already in baggies. No baggies being prepared to put more meth in. The evidence as a whole shows that there was no meth. He couldn't have had a meth lab there. The ingredients weren't even there to make it. What about the recorded conversations? The recorded? They're not here. They're not in the brief. They weren't included in the records sent up. And I don't think that we can consider them. We don't know what was in those recorded conversations. The jury heard it. I haven't heard it. I'm sure Mr. Sherman has. Did the jury hear it? It was my impression that some of the recordings were played to the jury. There were some that were played. I have to tell you the truth right off the top of my head. I don't know which ones were. I know that they're not here. They're not before us. And the letter. And at one point, if I remember correctly, when Small talked about the letter, he said that it said that he was dealing in meth, marijuana, and cocaine. Now, I would check. I'm not sure about that. But I know at more than one point, in fact, two or three points, Officer Small said that. And, again, I think the first half of the appellee's brief, quite frankly, to some extent supports what I'm saying. And the fact that two or three were dismissed have nothing to do with it. Thank you, Your Honor, for your time. Let me ask you something about the sentences. We do have a mandatory life sentence for one count, but the others were guideline sentences. Does that matter for our purposes of review that we're looking with the mandatory life? Does that negate any other issue you may have for sentencing? You know, that's something to consider. And, in fact, I think if we're going to be strict followers of the law, I think the answer is yes. And I think he deserves to be resentenced on those. Any matters that he was sentenced upon regarding where the judge thought the guidelines were binding upon him, Mr. Aguirre-Gonzalez, I believe has a constitutional right to be resentenced on those matters because of Booker, because the judge thought that those guideline matters were binding on him and they're not. And he needs to have that mindset when he sentences. It may turn out worse for Mr. Aguirre-Gonzalez. It may turn out better. But either way, it's his constitutional right to be sentenced with the judge having the correct mindset of what the law is. Even if he has a mandatory life sentence already? Well, again, I understand the practicality of that. And, frankly, to a large extent, I agree with that mindset. Hey, what's the use? But we never know what the future is going to hold. And I think, again, if we're lovers of the law, so to speak, ultimately yes. Why would it make any difference, though? The judge obviously knew that there was a difference between the guideline exposure and the statutory exposure. He imposed a life sentence, but under the guidelines, as I understand it, imposed a 360-month sentence, a lesser sentence. Why wouldn't it be an exercise in futility to send it back and say would your judgment be any different if you knew the guidelines were advisory? It may even be likely that in a very practical sense you're right. But, I mean, sometimes these are procedural rights. And I think procedural rights are something that we have to go by whether we change it or not. I mean, I've read a lot of cases of it. I mean, there was a recent case sent back by the Supreme Court, and the judge said, you know, probably nothing, the writer of the opinion, I remember saying, there's probably nothing going to change, but this is the way we do it. So they were going to send it back to be done right. And that's just the way it should be. This particular judge usually is pretty verbal about when he feels his hands are tied regarding the guideline range. We've had several cases where he expressed a sense of frustration due to the guidelines. But I don't think that that was in this particular case. There was any sentiment expressed by the judge one way or the other. Is that true? I know the Honorable Judge Shea. I think he's a great judge. To answer that question, I couldn't truthfully. All right. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court. The court stands at recess until 9 o'clock a.m. tomorrow morning.
judges: Rawlinson, Clifton, Burns